UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,                    15-CR-142-EAW-MJR

                                             REPORT AND RECOMMENDATION

        -v-

THOMAS SCANLON,

                Defendant.
_____

        This case has been referred to the undersigned by the Hon. Elizabeth A. Wolford pursuant to 28 U.S.C. §636(b)(1) for supervision of pre-trial proceedings and to hear and report on all suppression motions.  (*See* Dkt. Nos. 35, 436).

        On March 16, 2016, a federal grand jury in the Western District of New York returned a forty-six count Second Superseding Indictment charging sixteen members of the Kingsmen Motorcycle Club with RICO Conspiracy and related firearm, drug trafficking, and violent offenses.  (*See* Dkt. No. 33).  Defendant Thomas Scanlon is charged with ten counts:  Count 1 (RICO Conspiracy); Count 2 (Possession of Firearms in Furtherance of Crime of Violence); Counts 27 and 28 (Obstruction of Justice); Counts 29 and 30 (False Statements Before Grand Jury – Irreconcilable Statements); Counts 41 and 45 (Using and Maintaining Premises for Drug Dealing); and Counts 42 and 46 (Possession of Firearms in Furtherance of Drug Trafficking Crime).

        On December 7, 2016, the defendant filed an omnibus pre-trial motion, which includes a motion to suppress evidence seized from his residence in Hinsdale, New York on March 22, 2016.  (Dkt. No. 385 at 20-22).  More particularly, the defendant

seeks to suppress three pistols seized from his residence that day.[1]  On February 7, 2017, the Court granted the defendant's request for an evidentiary hearing on his motion to suppress evidence.  (Dkt. No. 486).

The evidentiary hearing commenced on March 3, 2017 and continued on March 29 and April 13, 2017.  On March 3, Detectives Cory Higgins and Kenneth Rice of the Cattaraugus County Sheriff's Office testified.   On March 29, Undersheriff (retired) Robert Buchhardt and Captain Shawn Gregory of the Sheriff's Office testified, as did Cattaraugus County Court Judge Ronald Ploetz and his secretary, Mary Reynolds.  On April 13, Sheriff's Office pistol permit clerk Maella Reynolds testified.[2]  The defendant did not call any witnesses, but he did submit a declaration ("Scanlon Dec.") describing, among other things, the seizure of the three pistols from his residence.  (Dkt. No. 476-1).  In addition, the defendant and the government stipulated that if the defendant's wife, Sherry Scanlon, testified at the hearing, she would testify that she received Defense Exhibit F1 on the morning of March 22, 2016.  (T2: 103-04).  In total, the Court received the following exhibits into evidence at the hearing:  Government Exhibits ("Govt. Exs.") 1A, 1B, 2A, 2B, 2C, 3A, 3B, 4-10, 14-18; Defense Exhibits ("Def. Exs.") F and F1; and Court Exhibits ("Ct. Exs.") 1 and 2.  (*See* Dkt. Nos. 523, 547, 558 (minute entries for evidentiary hearing)).   The parties thereafter filed post-hearing briefs (*see* Dkt. Nos. 658, 659, 679, 681), and the Court heard oral argument on July 24, 2017 (Dkt. No. 702).

---

[1]    The defendant does not seek to suppress two thirty-round magazines seized from his residence or law enforcement's observations of certain long guns in his residence.  (*See* Dkt. No. 681 at 1 n.1).

[2]    Transcripts of the March 3 (Dkt. No. 632), March 29 (Dkt. No. 631), and April 13, 2017 (Dkt. No. 633) proceedings are designated as T1, T2, and T3, respectively.

After considering the evidence adduced at the hearing, the submissions of the parties, and argument from counsel, it is recommended that the defendant's motion to suppress evidence be denied in its entirety.

## FINDINGS OF FACT

On March 16, 2016, the Court issued an arrest warrant for the defendant pursuant to the return of the Second Superseding Indictment. (Govt. Ex. 14).[3] The FBI planned on arresting the defendant at his residence in Hinsdale, New York on March 22, 2016, and it requested the Cattaraugus County Sheriff's Office Special Response Team to assist with the arrest. (T1: 6). Detective Cory Higgins, the Commander of the Special Response Team, accepted the assignment and informed Undersheriff Robert Buchhardt of the planned arrest. (T1: 5-6). Undersheriff Buchhardt thereafter confirmed with the Sheriff's Office pistol permit clerk, Maella Reynolds, that the defendant had a pistol permit on file in Cattaraugus County. (T2: 40-41). On March 18, 2016, Undersheriff Buchhardt visited Judge Ronald Ploetz, the Cattaraugus County Court Judge responsible for pistol permit suspensions, to request an order suspending the defendant's pistol permit. (T2: 22, 41; Govt. Exs. 16, 17). Undersheriff Buchhardt informed Judge Ploetz that the defendant had been indicted as part of a federal RICO investigation, to which Judge Ploetz responded that he would "absolutely" suspend the defendant's pistol permit. (T2: 23-25, 30-31, 41-42). Judge Ploetz then asked his secretary, Mary Reynolds, to create an order suspending the defendant's pistol permit. (T2: 8-9, 11-13, 24-27). Because Judge Ploetz was unsure when the defendant's arrest would be effectuated, he directed Mary Reynolds to leave certain information on the

---

[3]    The Court later issued a search and seizure warrant authorizing a search of the defendant's residence for his person. (Govt. Ex. 15).

order blank so that it could be filled in at a later time.  (T2: 8-9, 24-28).  The suspension order prepared by Mary Reynolds states that the defendant's pistol permit "is hereby suspended" and "any representative of the Cattaraugus County Sheriff's Department [may] take into his possession any handguns registered thereon," but it left blank the date of the defendant's arrest, the reason for his arrest, the Judge's signature, and the date of the order.  (T2: 17; Govt. Ex. 16).  Mary Reynolds does not recall what happened to the suspension order after she gave it to Judge Ploetz.  (T2: 13).  Judge Ploetz testified that he signed and dated the suspension order, but that he left the date of the defendant's arrest and, possibly, the reason for his arrest, blank.  (T2: 30-31, 33).

Maella Reynolds, Sherry Scanlon, and Captain Shawn Gregory have different accounts of what information was filled in on the suspension order and when it was filled in.  Maella Reynolds testified that the first time she viewed the suspension order, certain information was not filled in — namely, the date of the defendant's arrest, the reason for his arrest, the Judge's signature, and the date of the order.  (T3: 11-14).  She sent the blank order back to Judge Ploetz's chambers and received back a version that included Judge Ploetz's signature and the date of the order (March 23, 2016).  (T3: 12-14).  Maella Reynolds then inserted the date of the defendant's arrest (March 22, 2016) and the reason for his arrest (FBI arrest warrant) in the two remaining blank spaces.  (T3: 11-12).  Maella Reynolds does not recall the date or dates on which these events occurred.  (T3: 13).  This completed version of the suspension order is in evidence as Government Exhibit 9.[4]  The government and the defendant stipulated that if Ms. Scanlon testified at the hearing, she would testify that on the morning of March 22, 2016 she received a suspension order with Judge Ploetz's signature on the bottom but with

---

[4]      Government Exhibit 18 is the original of Government Exhibit 9.

all other information (the date of the order, the date of the defendant's arrest, and the reason for his arrest) blank.  (T2: 103-04).  This incomplete version of the suspension order is in evidence as Defense Exhibit F.[5]  Captain Gregory, who Undersheriff Buchhardt tapped to serve the suspension order on the defendant, ultimately testified that he must have served the incomplete version of the suspension order (Def. Ex. F) on Ms. Scanlon and that someone had to have filled in the remaining information sometime thereafter.  (T2: 96-98).  Captain Gregory was not, however, aware of any blank spaces on the order when Undersheriff Buchhardt gave it to him.  (T2: 63).

After carefully considering the foregoing testimony, the Court finds that Captain Gregory served only the incomplete version of the suspension order (Def. Ex. F) on Ms. Scanlon on the morning of March 22, 2016.  With regard to the completed version of the suspension order (Govt. Ex. 9), it seems that this version of the order was not completely filled in until March 23, 2016 or sometime thereafter.  However, as will be discussed *infra*, the uncertainty surrounding the completed version of the suspension order (Govt. Ex. 9) does not affect the Court's analysis of the defendant's motion.

Meanwhile, the Special Response Team went about preparing to arrest the defendant at his residence in Hinsdale.  The team, which consisted of approximately twenty officers, assembled in Hinsdale around 5:00 a.m. on March 22, 2016 for a pre-arrest briefing.  (T1: 11, 38, 70).  At approximately 6:00 a.m. that morning, the team knocked and announced its presence at the defendant's residence, and Ms. Scanlon opened the door.  (T1: 12-13).  The team then entered the residence and secured it in a matter of minutes, encountering the defendant's daughter and her boyfriend in the process.  (T1: 12-13, 38-39).  Team members placed Ms. Scanlon, her daughter, and

---

[5]    Defense Exhibit F1 is the original of Defense Exhibit F.

her daughter's boyfriend in the kitchen of the residence.  (T1: 39).  The team did not find the defendant, who, as it turned out, was in North Carolina on a business trip.  (T1: 14-15, 39; T2: 66-67).

While helping to secure the residence, Detective Higgins observed two high-capacity magazines on a coffee table in the living-room area of the residence.  (T1: 15-16; Govt. Exs. 2A, 2B, 2C).  Detective Higgins called over Detective Kenneth Rice, who determined that the magazines were illegal under the New York State SAFE Act.  (T1: 21-22, 72-73).  Detective Rice left the residence and obtained a search and seizure warrant from Cattaraugus County Court Judge Michael Nenno to search for and seize any high-capacity magazines and associated firearms within the defendant's residence.  (T1: 77-79; Govt. Exs. 3A, 3B, 4).  Detective Rice executed the warrant later that day, but he did not find any high-capacity magazines or associated firearms beyond the two magazines he had observed in the residence earlier that morning.  (T1: 49, 79-81).  Detective Rice seized the two high-capacity magazines from the residence.  (T1: 81-82; Govt. Ex. 5).

Around the time Detective Rice applied for the search and seizure warrant, Captain Gregory went about seizing the defendant's pistols from the residence.  Upon entering the residence, Captain Gregory handed Ms. Scanlon the incomplete version of the suspension order (Def. Ex. F) and asked for and received her permission to remove the defendant's pistols from the residence.  (T2: 66-67).  As testified to by Captain Gregory:

> When I spoke to [Ms. Scanlon], I just identified myself, you know, as being a captain from the sheriff's office, and that we had a pistol permit suspension. I gave her the copy [of the suspension order] that was given to me to serve on [the defendant]. And at the time she told me that he was out of town — I believe North Carolina — on business. I said well, I said that's okay. I said what I'm going to do is leave the pistol permit suspension with you, and if it's okay, I'd like your permission to take the firearms out of the house. And which she verbally granted me permission.

(T2: 67).

Ms. Scanlon did not testify at the hearing. The defendant suggests in his declaration, though, that Ms. Scanlon did not verbally permit Captain Gregory to take the pistols from the residence, stating that law enforcement simply "directed [Ms. Scanlon] to unlock one of [his] gun safes and turn over two of [his] pistols that were securely located in that safe." (Scanlon Dec. ¶5). Given that the defendant also did not testify at the evidentiary hearing and was not present when Captain Gregory and Ms. Scanlon spoke about the pistols, the Court credits Captain Gregory's account of his conversation with Ms. Scanlon over the account given by the defendant in his declaration, and the Court thus finds that Ms. Scanlon did in fact give Captain Gregory verbal permission to remove the defendant's pistols from the residence. Captain Gregory removed two of the pistols from a large, locked firearm cabinet located in the master bedroom shared by the defendant and Ms. Scanlon. (T1: 24-25; T2: 68-69; Govt. Exs. 1A, 1B; Dkt. No. 658 at 10 (Deft.'s post-hearing brief describing the master bedroom as the "Scanlons' bedroom")). Ms. Scanlon unlocked the firearm cabinet for Captain Gregory (Scanlon Dec. ¶5), but Captain Gregory could not recall at the hearing if it was Ms. Scanlon or someone else who located the keys to unlock the cabinet (T2: 69).

Around this time, the defendant's daughter was speaking with the defendant on her cell phone, and she handed her phone to Captain Gregory to allow him to ask the defendant about his pistols. (T2: 67-68). Captain Gregory advised the defendant about the suspension order and the arrest warrant, explained to the defendant that he was "looking to obtain the firearms that were on his pistol permit," and inquired about accessing a lockbox that might contain the third pistol. (T2: 68, 70-71, 87). The defendant responded "no problem." (T2: 68). He advised Captain Gregory that the third pistol was either in the lockbox under his bed or in his vehicle. (T2: 68). The defendant then told his daughter where to find the lockbox key (Scanlon Dec. ¶8), and Captain Gregory used the key to open the lockbox, which ended up containing the third pistol (T2: 68; Scanlon Dec. ¶8). After all three pistols were located, Ms. Scanlon signed an Evidence/Property Record form transferring custody of the pistols to Captain Gregory. (T2: 75; Govt. Ex. 7).

The next day, March 23, 2016, the defendant arrived in Buffalo, New York and turned himself into the FBI. (T2: 77). The defendant formally surrendered his pistol permit to the Sheriff's Office on May 23, 2016. (Govt. Ex. 10).

The Court finds all of the witnesses who testified at the suppression hearing to be credible. Although some witnesses gave different accounts regarding the two versions of the suspension order (Govt. Ex. 9; Def. Ex. F), each witness testified to the best of his or her recollection.

## CONCLUSIONS OF LAW

The defendant moves to suppress the three pistols Captain Gregory seized from his residence on March 22, 2016. The government argues that although it did not have

a warrant to search for and seize the pistols, the pistols should not be suppressed because Ms. Scanlon and the defendant consented to the search and seizure.[6]  The government's consent argument turns on three distinct issues:  (1) Ms. Scanlon's authority to consent to the search of the firearm cabinet that contained two of the pistols; (2) whether Ms. Scanlon voluntarily consented to the search of the firearm cabinet; and (3) whether the defendant voluntarily consented to the search of the lockbox that contained the third pistol and to the seizure of his pistols.  The Court will address each issue in turn.

I.     *Ms. Scanlon Had Apparent Authority to Consent to the Search of the Firearm Cabinet*

The government may justify a warrantless search by "show[ing] that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."  *United States v. Matlock*, 415 U.S. 164, 171 (1974).  A third party has actual authority to consent to a search if "first, the third party had access to the area searched, and, second, either:  (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access."  *United States v. McGee*, 564 F.3d 136, 139-40 (2d Cir. 2009) (quoting *United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992)).  "[A]ccess to the area searched" under the first prong "depends on the understandings communicated by the titular owner to [the consenting] person."  *Id.* at 140.  Here, the Court is unable to find that Ms. Scanlon had actual authority to consent to the search of

---

[6]    Given the Court's finding that the defendant and Ms. Scanlon voluntarily consented to the search and seizure, it need not address the government's alternative argument that the inevitable discovery doctrine applies or the government's argument that the cost of applying the exclusionary rule outweighs the benefits.

the firearm cabinet because the record does not indicate whether or not the defendant, as titular owner of the firearm cabinet (*see* Scanlon Dec. ¶5), ever communicated to her that she had "access" to the cabinet. *McGee*, 564 F.3d at 140. However, "[e]ven if the person giving consent in fact lacked [actual] authority to do so, the consent may nonetheless validate the search if the person reasonably appeared to the police to possess authority to consent to the search." *Id.* at 139. "In other words, in the absence of actual authority, law enforcement may rely upon apparent authority so long as the reliance is not 'unrealistic.'" *United States v. Nayyar*, 221 F. Supp. 3d 454, 464 (S.D.N.Y. 2016) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 187-88 (1990)). Apparent authority "must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Rodriguez*, 497 U.S. at 188 (internal quotation marks, citation, and alteration omitted).

"The Second Circuit has suggested that marriage and shared ownership of property are important factors to consider in assessing whether a third-party has authority to consent to a search." *United States v. LeClerc*, 185 F. Supp. 3d 370, 377 (W.D.N.Y. 2016) (citing *Moore v. Andreno*, 505 F.3d 203, 211 (2d Cir. 2007)). As the *LeClerc* Court found, a rebuttable presumption applies when one spouse consents to a search of the marital residence: a spouse presumptively has authority to consent to a search of all areas of the residence, but the nonconsenting spouse may rebut this presumption by showing that law enforcement knew or had reason to know that the particular area searched was "off-limits" to the consenting spouse. *Id.* at 378. Applying the presumption to the facts of this case, Ms. Scanlon could presumptively consent to

Captain Gregory searching all property within the residence she shared with the defendant, including the firearm cabinet that contained two of the three pistols, but the defendant can rebut this presumption by showing that Captain Gregory knew or had reason to know the firearm cabinet was off-limits to Ms. Scanlon. *See id.*

The defendant has not rebutted the presumption here because Captain Gregory neither knew nor had reason to know that the defendant's firearm cabinet was off-limits to Ms. Scanlon. Captain Gregory had no reason to believe that the defendant had exclusive use of the firearm cabinet because the defendant kept the cabinet in plain view in the master bedroom he shared with Ms. Scanlon. *See United States v. Amratiel*, 622 F.3d 914, 916 (8th Cir. 2010) (finding spouse had apparent authority to consent to search of firearm safe located in the garage of the marital residence). Captain Gregory likewise had no reason to believe that the defendant intended to keep the contents of the firearm cabinet private, as the cabinet has a large glass door through which Ms. Scanlon could easily observe several firearms. (T1: 24-25; Govt. Exs. 1A, 1B). Although the cabinet was locked on the day of the search, it seems that this was done for safety reasons, not to keep Ms. Scanlon from accessing the cabinet. Indeed, the defendant did not take the key to the cabinet with him when he traveled to North Carolina on business. After Ms. Scanlon granted Captain Gregory permission to take the defendant's pistols, someone in the residence (it is not clear who) located the key to the cabinet, and Ms. Scanlon used it to unlock the cabinet for Captain Gregory. (Scanlon Dec. ¶5). There is no evidence in the record suggesting that Ms. Scanlon objected to the search or somehow indicated to Captain Gregory that the firearm cabinet was off-limits to her.

Given the location and characteristics of the firearm cabinet, along with Ms. Scanlon's ability to access it, Captain Gregory simply had no reason to believe that the cabinet was off-limits to Ms. Scanlon. Thus, the defendant has failed to rebut the marital presumption. Even if the Court did not apply the marital presumption, the facts available to Captain Gregory at the moment of the search made it reasonable for him to believe that Ms. Scanlon had authority over the firearm cabinet. *See Rodriguez*, 497 U.S. at 188. Therefore, the Court concludes that Ms. Scanlon had apparent authority to consent to Captain Gregory's search of the firearm cabinet.

II.    <u>*Ms. Scanlon Voluntarily Consented to the Search of the Firearm Cabinet*</u>

The Fourth Amendment prohibits unreasonable searches and seizures. "[A] search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (second alteration in original) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "One such exception is a search that has been consented to . . . ." *United States v. Sanchez*, 635 F.2d 47, 58 (2d Cir. 1980). "For such a consent to be valid, however, it must be voluntarily and freely given. It may not be the product of duress or coercion, flagrant or subtle . . . ." *Id.* The government bears the burden of proving by a preponderance of the evidence that the consent to search was in fact voluntary. *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004). The government cannot meet this burden "by only showing acquiescence to a claim of lawful authority." *United States v. Ruiz-Estrella*, 481 F.2d 723, 727 (2d Cir. 1973).

Voluntariness "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227.  "Relevant considerations include, but are not limited to, the age of the subject, his level of education and intelligence, and whether he was deprived of food or sleep or subjected to other physical abuse." *Sanchez*, 635 F.2d at 58.  "While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." *Schneckloth*, 412 U.S. at 227.

Here, once the Special Response Team finished securing the defendant's residence, Captain Gregory entered the residence and gave Ms. Scanlon the incomplete version of the suspension order (Def. Ex. F).  It was not misleading for Captain Gregory to rely on the incomplete version of the suspension order (Def. Ex. F) because Judge Ploetz validly suspended the defendant's pistol permit a few days earlier.  In particular, after advising Undersheriff Buchhardt that he would "absolutely" suspend the defendant's pistol permit, Judge Ploetz signed the incomplete version of the suspension order (Def. Ex. F).  Although missing certain information, the incomplete version of the suspension order (Def. Ex. F) clearly states that the defendant's pistol permit "is hereby suspended," and it directs "any representative of the Cattaraugus County Sheriff's Department [to] take into his possession any handguns registered thereon."  That the completed version of the suspension order (Govt. Ex. 9) might not have been finalized until March 23, 2016 or sometime thereafter is of no moment because the defendant has not identified any legal authority requiring a suspension

order to include certain information or that it be reduced to writing.[7]  Thus, because Judge Ploetz validly suspended the defendant's pistol permit prior to March 22, Captain Gregory did not mislead Ms. Scanlon by handing her the incomplete version of the suspension order (Def. Ex. F).

After Captain Gregory handed the incomplete version of the suspension order (Def. Ex. F) to Ms. Scanlon, he requested her permission to take the defendant's pistols from the residence, and Ms. Scanlon verbally granted him permission:

> When I spoke to [Ms. Scanlon], I just identified myself, you know, as being a captain from the sheriff's office, and that we had a pistol permit suspension.  I gave her the copy [of the suspension order] that was given to me to serve on [the defendant].  And at the time she told me that he was out of town — I believe North Carolina — on business.  I said well, I said that's okay.  I said what I'm going to do is leave the pistol permit suspension with you, *and if it's okay, I'd like your permission to take the firearms out of the house.  And which she verbally granted me permission.*

(T2: 67) (emphasis added).  As can be seen from Captain Gregory's conversation with Ms. Scanlon, Captain Gregory did not threaten, harass, coerce, or abuse Ms. Scanlon, who was not in custody or handcuffs.  Ms. Scanlon's age and education are not set forth in the record, but based on her interactions with Captain Gregory, it is clear that she is of adult age and understands and speaks the English language.  It is true that Captain Gregory did not advise Ms. Scanlon of her right to withhold her consent, but "knowledge of the right to refuse consent is not a requirement to a finding of voluntariness."  *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).  The Court thus finds that Ms.

---

[7]    N.Y. Penal Law §400.00(11), which pertains to the revocation and suspension of licenses to carry firearms, does not specifically require a suspension order to include certain information or that it be reduced to writing.

Scanlon voluntarily consented to Captain Gregory taking the defendant's pistols from the residence.

After Ms. Scanlon granted Captain Gregory permission to take the defendant's pistols from the residence, she assisted with the search for the pistols by unlocking the defendant's firearm cabinet.  Having authorized Captain Gregory to take the defendant's pistols from the residence, it would have made little sense for Ms. Scanlon to deny him access to the cabinet in which the pistols were kept.  Thus, contrary to the defendant's argument (*see* Dkt. No. 681 at 3-4), not only did Ms. Scanlon voluntarily consent to Captain Gregory taking the pistols from the residence, she also voluntarily consented to him searching the cabinet for two of the pistols.  *See United States v. Zabala*, 52 F. Supp. 2d 377, 385 (S.D.N.Y. 1999) (consent to search voluntary where the police asked the defendant if "we can take a look inside" and the defendant responded by unlocking and opening the apartment door); *see also United States v. Williams*, 181 F. Supp. 2d 267, 284-85 (S.D.N.Y. 2001) (consent to search car and apartment voluntary where the defendant assisted with the search).

In sum, the totality of the circumstances show that Ms. Scanlon did not merely acquiesce to a claim of lawful authority but rather voluntarily consented to Captain Gregory's search of the firearm cabinet that contained two of the three pistols.  Thus, the search did not violate the Fourth Amendment.

III.   *The Defendant Voluntarily Consented to the Search of His Lockbox and the Seizure of His Pistols*

The defendant's characteristics and actions indicate that he voluntarily consented to Captain Gregory seizing all three of his pistols and searching his lockbox for one of

his pistols. The defendant is an intelligent adult — he has a degree in business management and worked as a regional sales manager for a large chemical company. (Dkt. No. 386 (Hoover Dec.) Ex. A). Captain Gregory spoke with the defendant by telephone on the day of the search and seizure and advised the defendant about the suspension order and the arrest warrant. He told the defendant that he was "looking to obtain the firearms that were on his pistol permit," and he inquired about accessing a lockbox that might contain the third pistol. The defendant responded "no problem" and had his daughter retrieve the key to open the lockbox. The defendant's cooperation is strong evidence that he voluntarily consented to the search and seizure. *See United States v. Jaramillo*, 841 F. Supp. 490, 492 (E.D.N.Y. 1994) (consent to search apartment voluntary where the defendant told law enforcement he had "no problem" with the search); *Williams*, 181 F. Supp. 2d at 284-85 (consent to search car and apartment voluntary where the defendant pointed out the keys to his car and apartment). Accordingly, the defendant voluntarily consented to Captain Gregory searching his lockbox and seizing his pistols, and the search and seizure thus did not violate the Fourth Amendment.

## <u>CONCLUSION</u>

For the foregoing reasons, it is recommended that the defendant's motion to suppress evidence (Dkt. No. 385) be denied in its entirety.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ORDERED that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Wolford, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of

this Report and Recommendation in accordance with the above statute, Rules 59(b), 45(a), and 45(c) of the Federal Rules of Criminal Procedure, and Local Rule of Criminal Procedure 59. Any requests for an extension of this deadline must be made to Judge Wolford.

**Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Criminal Procedure 59(c)(2), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

**SO ORDERED**.

Dated:         August 10, 2017
               Buffalo, New York

                              */s/ Michael J. Roemer*
                              MICHAEL J. ROEMER
                              United States Magistrate Judge